IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DENISE A. CARR, | ) | Case No. 1:18-cv-1789 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Denise A. Carr, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XIV of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Carr's application for supplemental security income benefits be AFFIRMED.

## II.    Procedural History

On June 22, 2015, Carr applied for DIB and SSI.  (Tr. 1109-21).[1]  Carr alleged that she became disabled on March 27, 2015, due to:

> Lung cancer stage 1, copd, heart problems, chronic pain; chronic pain condition – multiple pain sites; COPD – very short of breath; chronic systolic congestive heart failure – very SOB; antiphospholipid syndrome – blood disorder; chronic

---

[1] The administrative transcript is in ECF Doc. 10.

> obstructive asthma – very short of breath; foggy thinking with word loss; cognitive and memory impairment; STEMI heart attack – with heart damage; myofascial pain syndrome – pain in multiple joints; lung cancer – A1 – removed a section of my lung – very SOB.

(Tr. 980, 996, 1109, 1115).  The Social Security Administration denied Carr's application initially and upon reconsideration.  (Tr. 1109-21).  Carr requested an administrative hearing. (Tr. 1075-77).  ALJ Joseph Hajjar heard Carr's case on August 11, 2017, and denied the claim in a December 28, 2017, decision.  (Tr. 8-55).  On June 25, 2018, the Appeals council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7). On August 2, 2018, Carr filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Carr was born on July 8, 1966, and she was 48 years old when she filed her application. (Tr. 1109, 1115).  Carr turned 50 on July 8, 2016.  The ALJ considered Carr as "closely approaching advanced age" for the entire relevant period.  (Tr. 21).  Carr graduated from high school and attended college for eight months.  (Tr. 21, 36).  Carr had past work experience as a retail stocker, but she could no longer perform her prior work and had no transferrable skills. (Tr. 21).

### B.    Relevant Medical Evidence

On May 2, 2014, Carr saw Mohamad Varghai, MD, for treatment related to her history of deep vein thrombosis ("DVT"), pulmonary embolism, and lung nodule.  (Tr. 1292).  Dr. Varghai noted that Carr had arthroscopic knee surgery in August 2013, and that she went to the emergency room with shortness of breath and chest pain in September 2013.  (Tr. 1292).  Carr denied any wheezing, cough, or shortness of breath at rest, but she had occasional dyspnea on exertion with moderate activity.  (Tr. 1293).  On examination, Dr. Varghai noted clear lungs,

mild tenderness over Carr's right knee, no tenderness in her spine or chest, and no signs of arthritis.  (Tr. 1293).  He also noted that Carr "ambulate[d] with assistance."  (Tr. 1293).

On May 9, 2014, Carr had a chest CT, which showed that her lung nodule's density increased, but there was no evidence of any more blood clots.  (Tr. 1384-85).

On January 16, 2015, Carr went to the emergency department for chest pain and shortness of breath.  (Tr. 1276-78).  Carr said her pain was worse with walking.  (Tr. 1276).  On examination, Patrick Gray, DO, noted that Carr's breathing effort and sounds were normal and she had normal range of motion.  (Tr. 1277).  An EKG showed "ST elevated myocardial infarction," for which Carr was admitted.  (Tr. 1277-80).  Carr was discharged on January 19, 2015, with a diagnosis of ST elevation myocardial infarction, coronary artery disease, pulmonary embolism, right atrial thrombus, and adenocarcinoma.  (Tr. 1270).  At discharge, she had clear lungs, a regular heart rhythm, and no issues noted in her extremities.  (Tr. 1270).  Carr also told Stephen Ellis, MD, that she was not on home oxygen, did not use any assistive devices, and could obtain her medication herself.  (Tr. 1269).  At a follow-up on January 26, 2015, Carr said that she was doing well following her discharge and denied any chest pain.  (Tr. 1252).  On examination, Lisa Bartone, PA, noted that Carr had a normal gait and ambulation, and that she was able to participate in an exercise program.  (Tr. 1253).  On January 30, 2015, Carr told Dr. Gray noted that she had no shortness of breath, weakness, dizziness, back pain, or extremity issues, and Dr. Gray noted that she had full range of motion on examination.  (Tr. 1248-49).  On February 16, 2015, Carr told Dr. Ellis that continued to have fatigue, chest pain, and shortness of breath, but she denied any pain when walking.  (Tr. 1245-46).  On examination, Dr. Ellis noted that Carr's condition was overall normal, but that she was probably having issues due to stress and depression.  (Tr. 1246).  On March 18, 2015, Carr told Dr. Ellis that she continued feeling bad, was short-winded when walking more than 30-40 feet, and was not able to cut back on

smoking due to stress.  (Tr. 1238-39).  On examination, Dr. Ellis noted that Carr had no joint pain or pain with walking, clear lungs, and no wheezing.  (Tr. 1240).

On May 10, 2015, Carr went to the emergency department for "body pain."  (Tr. 1433).  The medical records from her visit indicated that she had full range of motion in her extremities, normal gait, and a normal back.  (Tr. 1433-35).  At a follow-up on May 12, 2015, Carr told Courtney Borruso, MD, that she had leg cramps, but she did not have any shortness of breath, chest pain, or issues with her lower extremities.  (Tr. 1456-57).  She also denied back pain or walking difficulties.  (Tr. 1457).  On examination, Dr. Borruso noted that Carr's gait and respiration were normal.  (Tr. 1461).

On May 19, 2015, Carr told John Hill, MD, that medication and rest helped her back and knee pain.  (Tr. 1232).  On examination, Dr. Hill noted that Carr had asthma/COPD, arthritis, clear lungs, full range of motion, and right knee pain with crepitus.  (Tr. 1233-34).  He also noted that Carr continued to smoke.  (Tr. 1233).  Dr. Hill prescribed pain medications.  (Tr. 1234).

On June 10, 2015, Carr saw Mark Rorick, MD, for "painful muscle spasms."  (Tr. 1584).  Carr said that her muscle cramps were worse at night, kept her from sleeping, and were reduced with icing and walking.  (Tr. 1584).  Carr said that she could not walk up and down stairs.  (Tr. 1584).  Carr denied any shortness of breath at rest, but said she had a "chronic cough and shortness of breath during exertion."  (Tr. 1584).  She also said that she had "no difficulty walking," despite saying that she had arthralgias, joint swelling and stiffness, muscle weakness, and back and limb pain.  (Tr. 1585).  On examination, Dr. Rorick noted that Carr was in no acute distress, had normal motor functions, had full muscle strength, and had a stable and normal gait.  (Tr. 1589).  Dr. Rorick also stated that Carr had no evidence of any muscular disorders or atrophy and that she did not have any problems going up and down stairs.  (Tr. 1590).  He diagnosed Carr with a muscle spasm and gave her medications.  (Tr. 1590).

On July 29, 2015, Carr saw Mohammed Osman, MD, for a check-up related to her chest pain. (Tr. 1630). Dr. Osman noted that Carr had not had any further episodes of chest pain, but she continued to have smoking-induced COPD and sleep apnea. (Tr. 1630). Dr. Osman stated that, although Carr complained that she had shortness of breath, she did not have any resting shortness of breath, paroxysmal nocturnal dyspnea, orthopnea, or swelling feet. (Tr. 1630). Dr. Osman also requested a heart and lung scan, which Carr had done on August 4, 2015. (Tr. 1634, 2158). The scan indicated that Carr's lungs and heart were within the normal range, and that there was a low probability of blood clots in Carr's lungs. (Tr. 1650-51, 2158).

On September 3, 2015, Carr saw Dr. Borruso for a medication check. (Tr. 1659). Carr told Dr. Borruso that she quit smoking and used a nicotine patch and vaping to wean herself off cigarettes. (Tr. 1659). Carr said that her medications helped her anxiety and sleep issues, and that her chronic back pain was being treated. (Tr. 1659). Carr denied having any chest pain, joint issues, difficulty walking, or shortness of breath. (Tr. 1660). On examination, Dr. Borruso found that Carr had a normal respiratory rhythm and effort, normal heart, clear breathing sounds, and a normal gait. (Tr. 1664-65). An x-ray showed that Carr had some degenerative changes in her spine, dextroconvexity of the lumbar spine, and minimal retrolisthesis in her L3-4 and L4-5 vertebrae. (Tr. 1673-74).

On December 29, 2015, Carr told Dr. Borruso that she felt like she could not breathe and asked for steroids to treat her cough. (Tr. 2055). On examination, Dr. Borruso noted that Carr was not in respiratory distress, had normal respiration and clear breathing sounds, and had a normal gait. (Tr. 2060).

On January 3, 2016, Carr went to the emergency room for a cough, but she had no shortness of breath, no chest pain, and no wheezing. (Tr. 1911). Dr. Borruso noted that Carr had normal breathing effort and sounds and a normal range of motion. (Tr. 1921). At a follow-up on

January 5, 2016, Dr. Borruso noted that Carr had complex regional pain syndrome, COPD, and congestive heart failure.  (Tr. 2048).  Carr said that she had tight pain in her chest, fell due to shortness of breath, and could not breathe lying down.  (Tr. 2048).  She denied any difficulty walking.  (Tr. 2049).  Dr. Borruso ordered a CT and recommended use of a shower chair to prevent falls.  (Tr. 2054).

On January 25, 2016, Dr. Borruso noted that Carr was on a nebulizer and used albuterol sulfate to control her asthma.  (Tr. 2089).  Carr said that she had increased shortness of breath in the days before her appointment.  (Tr. 2089).  On examination, Dr. Borruso noted that Carr was well-developed, obese, had no increased work of breathing or signs of respiratory distress, and had a normal heart rate.  (Tr. 2094).  A CT scan showed a "tiny" nodule in her right middle lung lobe and signs of COPD.  (Tr. 2095).  Dr. Borruso also noted that Carr had lung cancer and a wedge resection in August 2014, and there was no evidence of recurrence.  (Tr. 2096).

On February 10, 2016, Carr told Dr. Osman that she did not have any chest pain, but she had exertional shortness of breath related to smoking-induced COPD.  (Tr. 2138).  Dr. Osman noted that Carr continued to smoke.  (Tr. 2138).  On examination, Dr. Osman noted that Carr was comfortable sitting, had normal breathing and heart sounds, and did not have any issues in her extremities.  (Tr. 2143).

On August 2, 2016, Carr had a CT of her lungs, which showed emphysematous changes, a new mass that was a possible metastasis, and no acute pulmonary process.  (Tr. 2200-01).  An August 5, 2016, pulmonary function test showed moderate obstructive artery disease, but there was no restrictive disease.  (Tr. 2204, 2231).

On November 8, 2016, Carr told Evan Howe, MD, that she had increasing shortness of breath, chest tightness, and chills.  (Tr. 2364).  On examination, Dr. Howe noted that Carr had

6

diminished breathing sounds, but she had good chest expansion, normal range of motion, and normal strength.  (Tr. 2366).  He continued Carr's medications.  (Tr. 2366-67).

On November 27, 2016, Carr went to the emergency department due to dizziness.  (Tr. 2305, 2314).  Carr denied any knee pain, chest pain, and shortness of breath.  (Tr. 2314).  On examination, David Levine, MD, noted that Carr had a normal heart and lung functions, no respiratory distress, normal range of motion, and no tenderness in her spine.  (Tr. 2316).  A CT scan showed no acute abnormalities, and Carr improved with intravenous fluids.  (Tr. 2310, 2317).

On December 5, 2016, Carr had a chest x-ray.  (Tr. 2402).  Sathyajit Kulasingham, MD, determined that Carr's heart was normal, and her lungs were within normal limits.  (Tr. 2402).  He noted that there was no pleural effusion or pneumothorax, but there were faint bibasilar infiltrates.  (Tr. 2402).

On February 14, 2017, Carr saw Preetha Muthusamy, MD, for treatment of tremors.  (Tr. 2444).  Carr said that her tremors started a year before her visit and gradually worsened.  (Tr. 2444).  Carr denied any slowness in her daily activities, but said that she had chest pain, leg pain with exercise, blood clots, leg swelling, shortness of breath, and coughing/wheezing.  (Tr. 2446-47).  On examination, Dr. Muthusamy noted that Carr had a normal heart function, normal breath effort and sounds, no wheezing, no respiratory distress, normal range of motion, full strength, normal coordination, no difficulty arising from a chair, and a mildly wide based gait.  (Tr. 2447-48).  Dr. Muthusamy observed a benign essential tumor, recommended discontinuing caffeine intake, and recommended thyroid, copper, and ceruloplasmin testing.  (Tr. 2448).

### C.      Relevant Opinion Evidence

On October 28, 2015, state agency consultant Steve McKee, MD, evaluated Carr's physical capacity based on a review of the medical record.  (Tr. 1024-27).  Dr. McKee determined that Carr could lift and/or carry up to 20 pounds occasionally and 10 pounds frequently, stand and/or walk for up to 6 hours in an 8-hour workday, sit for up to 6 hours in an 8-hour workday, and push and/or pull without limitation.  (Tr. 1024).  He determined that Carr could occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl.  (Tr. 1024).  Carr could never climb ladders/ropes/scaffolds.  (Tr. 1024).  She had no limitation to bending or tolerating wetness, noise, vibration, and hazards.  (Tr. 1024-25).  Carr to avoid concentrated exposure to extreme temperatures and humidity, and even moderate exposure to fumes, odors, dusts, gasses, and poor ventilation.  (Tr. 1025).  Dr. Freihofner opined that Carr could perform a range of light work.  (Tr. 1027).  On March 29, 2016, Anton Freihofner, MD, concurred with Dr. McKee's opinion.  (Tr. 990-993).

### D.      Relevant Testimonial Evidence

Carr testified at the ALJ hearing.  (Tr. 35-49).  Carr said that she weighed 200 pounds and lived with her fiancé, who was also disabled.  (Tr. 35-36).  She had a driver's license and occasionally drove.  (Tr. 36).  On a typical day, Carr would lie in her bed due to back pain and stiffness, drink coffee, take her pain medication, make her bed, straighten up the living room, dust, and fold stuff left on the couch.  (Tr. 40, 42).  Due to shortness of breath, Carr had to rest after she made the bed or did other chores.  (Tr. 40).  She did not do dishes, laundry, vacuum, mop, or sweep.  (Tr. 41).  She went grocery shopping with her fiancé, who pushed the cart and picked the items off the shelf.  (Tr. 42).  Carr's hobbies included vaping and reading for up to three hours per day.  (Tr. 42-43).  She did not go to church or socialize.  (Tr. 43).  Carr said that

she could walk up to 200 yards; could not stand, sit, or walk for six hours in an eight-hour day; and could not stand and walk for an hour.  (Tr. 48).

Carr testified that she last worked stocking shelves and maintaining retail store displays at Home Depot in March 2015.  (Tr. 37).  In that position, she lifted up to 150 pounds on occasion and 50 pounds frequently.  (Tr. 38).  She never operated a cash register.  (Tr. 38).  Before that job, Carr worked in the produce department of a grocery store, where she carried up to 75 pounds.  (Tr. 39).

Carr testified that she could not work due to back pain, difficulty breathing, and a blood clotting disease in her knee.  (Tr. 44-46).  She used opiates and acetaminophen for pain relief.  (Tr. 44).  She also had a TENS unit at home, which sometimes helped and sometimes aggravated her pain.  (Tr. 44).  Carr said that steroid injections did not help her back pain.  (Tr. 45).  For her breathing, Carr used a nebulizer (three times per week to every four hours), inhalers (two puffs per day), a rescue inhaler (three times per day), and air conditioning.  (Tr. 45-46).  Carr used aspirin and warfarin for her blood clotting.  (Tr. 45).  Carr also said that she had a "very fragile" meniscus and that she used cortisone shots after she tore her rotator cuff.  (Tr. 47).  Carr also said that she used a wheelchair when she went places that required long walks because she was not steady on her feet and had difficulty breathing, but she did not use it at home.  (Tr. 47).  Her wheelchair was prescribed one month before the ALJ hearing.  (Tr. 49).

Jacquelyn Schabacker, a vocational expert ("VE"), also testified at the ALJ hearing.  (Tr. 49-53).  The ALJ asked whether a hypothetical individual with Carr's age, experience, education, and RFC could work if she were limited to light-exertion work, except that:

> This individual can only occasionally climb ramps and stairs.  Can never climb ladders, ropes, or scaffolds.  This person can only occasionally balance, stoop, knee, crouch, and crawl.  This person can tolerate no more than frequent exposure to humidity and wetness and only occasional exposure to dust, odors, fumes, and pulmonary irritants, and no more than frequent exposure to extreme cold or extreme heat.

(Tr. 50-51). The VE testified that such an individual could not perform Carr's past work, but could work as a photocopy machine operator, mail clerk, and electronic accessories assembler. (Tr. 51). The VE testified that, if the hypothetical individual were limited to sedentary work, she could work as a document addresser, touch-up screener, and final assembler. (Tr. 51-52). The VE also testified that neither of the hypothetical individuals described in the ALJ's questions could work if they were: (1) off task 20 percent of the workday; or (2) absent tat least twice a month. (Tr. 52-53).

## IV.    The ALJ's Decision

The ALJ's December 28, 2017, decision found that Carr was not disabled and denied her applications for DIB and SSI. (Tr. 11-22). The ALJ found that Carr had not been engaged in substantial gainful activity since March 27, 2015, and that she had the severe impairments of: "heart disease, chronic obstructive pulmonary disorder (COPD), asthma, and deep vein thrombosis (DVT) of the right leg." (Tr. 13). The ALJ determined that Carr had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15). The ALJ determined that Carr had the RFC to perform light work, except that:

> the claimant can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; can only occasionally balance, stoop, kneel, crouch, and crawl; can tolerate no more than frequent exposure to humidity and wetness, and only occasional exposure to dusts, fumes, odors, pulmonary irritants; and can tolerate frequent exposure to extreme cold or extreme heat.

(Tr. 16).

In assessing Carr's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the "objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and 416.929 and SSR 16-3p." (Tr. 16). The ALJ noted that, in assessing Carr's alleged symptoms, he was required to:

evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(Tr. 16).  The ALJ explicitly discussed Carr's hearing testimony, stating that:

On a typical day, [Carr] will wake up and take medications.  She feels stiff in the mornings and her back hurts.  She will make the bed but the need to sit and rest for 15 minutes.  Her fiancé does most of the household chores, but she will help some straightening up.  She does not wash dishes or do laundry.  She does not vacuum, sweep, or mop.  She will do some dusting and cleaning up after her fiancé.  She goes grocery shopping with her fiancé but he will take the items off the shelves and into the cart.  She enjoys reading and does so for about three hours a day.  She does not go to church or participate in any social groups.  She stated she cannot currently work due to her back pain and issues with lung strength.  She quit her job at the Home Depot due to problems with shortness of breath and needing to rest after walking to the store from the parking lot.  She takes opiates and uses a TENS unit.  She has tried injections for her back but this has not been helpful.  She uses a nebulizer every four hours three times a week, and uses a rescue inhaler three times a day.  The claimant has problems with her right knee and had prior arthroscopic surgery (2008), and she still has pain.  She has problems lifting and carrying due to a rotator cuff tear.  She was prescribed a wheelchair and uses it when she knows she has to walk longer distances; she does not use it at home.  She can walk 200 yards at a time without the use of her wheelchair.  The claimant testified the wheelchair was prescribed the previous month, as she was concerned about her ability to get to the hearing office.

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.  Accordingly, these statements have been found to affect the claimant's ability to work only to the extent they can be reasonably accepted as consistent with the medical and other evidence.

(Tr. 16-17) (citation omitted).  The ALJ then exhaustively discussed the objective medical

evidence and medical opinion evidence in the record, and summarized his findings as follows:

Left ventricular ejection fraction was 55-60 percent (normal) in August 2015.  Left atrium was normal in size.  CT of the chest in January 2016 showed no evidence of pulmonary embolism.  The claimant denied chest pain in February 2016. She had baseline shortness of breath and continued to smoke.  In December

11

> 2016, x-ray of the claimant's chest showed faint bibasilar infiltrates.  The heart
> was of normal size and contour, and the pulmonary vessels were within normal
> limits. There was no pleural effusion or pneumothorax.  Musculoskeletal exam in
> February 2017 showed normal ROM, no edema, and no tenderness.  Motor tone
> and strength was normal 5/5. Coordination was normal.  Affect, judgement, and
> memory were normal.  Pulmonary/chest exam included effort normal[,] breath
> sounds normal, no respiratory distress, no wheezes or rales, and no tenderness.
> The claimant's gait has been observed to be overall normal throughout the record.

(Tr. 17-20) (citations omitted).  The ALJ also stated that he gave "great weight" to Dr. McKee's

and Dr. Freihofner's opinions.  (Tr. 20).  Based on his evaluation of Carr's testimony, the

objective medical evidence, and the opinion evidence, the ALJ found that Carr's "statements and

hearing testimony regarding the severity and limiting effects of her impairments to not be

entirely consistent with the totality of the objective medical record."  (Tr. 20).

Because the ALJ found that Carr was unable to perform all or substantially all of the

requirements of light work, the ALJ relied on the VE's testimony to determine whether Carr

could perform a significant number of jobs at the light exertional level with additional

limitations.  (Tr. 21-22).  Based on the VE's testimony and considering Carr's RFC, age,

education, and experience, the ALJ found that Carr was "able to perform the requirements of

representative occupations such as a photocopy machine operator, a mail clerk, and a bench

assembler."  (Tr. 22) (citations omitted).  In light of his findings, the ALJ determined that Carr

was not disabled from March 27, 2015, through the date of his decision and denied Carr's

applications for DIB and SSI.  (Tr. 22).

## V.    Law & Analysis

### A.    Standard of Review

The court's reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C.

§§ 405(g), 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003).

Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person

would accept as adequate to support a conclusion.  *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court does not decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court would reach a different conclusion or evidence could have supported a different conclusion.  42 U.S.C. §§ 405(g), 1383(c)(3); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.").  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.");  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant

evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006).  The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.      Carr's Subjective Symptom Complaints

Carr argues that the ALJ failed to apply proper legal standards in evaluating her subjective symptom complaints about her ability to perform the standing and walking requirements of light work.  ECF Doc. 13 at 5-8.  Specifically, Carr asserts that the ALJ failed to comply with SSR 16-3p, by rejecting her subjective complaints "solely because the objective medical evidence does not substantial the degree of impairment-related symptoms alleged."  *Id.*

at 7-8. Carr contends that the ALJ's discussion shows that he failed to comply with SSR 16-3p's requirement that ALJs consider additional factors in assessing subjective complaints, including:

> (1) daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, to relieve pain; (6) any measures used to relieve pain; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.

*Id.* at 8. Finally, Carr argues that the ALJ's failure to comply with SSR 16-3p resulted in a decision that was not supported by substantial evidence. *Id.* at 5, 8.

The Commissioner responds that the ALJ properly considered all the regulatory factors in rejecting Carr's subjective complaints, including the objective medical evidence, Dr. McKee's and Dr. Freihofner's opinions, Carr's testimony about her symptoms, Carr's daily living activities, and Carr's medications and other measures to alleviate her symptoms. ECF Doc. 15 at 9-13. The Commissioner asserts that, although the ALJ did not discuss those factors in a single paragraph, the ALJ's decision when read as a whole indicates that he considered all of the regulatory factors. *Id.* at 13. Further, the Commissioner argues that substantial evidence supported the ALJ's evaluation of Carr's subjective symptom complaints. *Id.* at 9-14.

In her reply brief, Carr asserts that the ALJ's decision explicitly states that he rejected her subjective symptom complaints based solely on their inconsistency with the objective medical evidence, and that the Commissioner's response is an improper post hoc rationalization. ECF Doc. 16 at 1.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony

about his symptoms when it is inconsistent with objective medical and other evidence.[2]  *See*

*Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 (Oct. 25, 2017) ("We will consider

and individual's statements about the intensity, persistence, and limiting effects of symptoms,

and we will evaluate whether the statements are consistent with objective medical evidence and

the other evidence.").  In evaluating a claimant's subjective symptom complaints, an ALJ may

consider several factors, including the claimant's daily activities, the nature of the claimant's

symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any

treatment, and any other factors concerning the claimant's functional limitations.  SSR 16-3p,

2016 SSR LEXIS 4; 20 C.F.R. §§ 404.1529(c)(3),  416.929(c)(3); *see also Temples v. Comm'r of

Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a

claimant's ability to perform day-to-day activities in determining whether his testimony

regarding his pain was credible).

     If an ALJ rejects a claimant's subjective complaints, he must clearly state his reasons for

doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  Nevertheless, an ALJ's

decision need not explicitly discuss each of the factors.  *See Renstrom v. Astrue*, 680 F.3d 1057,

1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as

he acknowledged and examined those [factors] before discounting a claimant's subjective

complaints." (quotation omitted)).  While the ALJ must discuss significant evidence supporting

---

[2] In explaining the importance of "other evidence," SSR 16-3p provides that:

> We will not evaluate an individual's symptoms based solely on objective medical
> evidence unless that objective medical evidence supports a finding that the individual is
> disabled. . . . If we cannot make a disability determination or decision that is fully
> favorable based solely on objective medical evidence, then we carefully consider other
> evidence in the record in reaching a conclusion about the intensity, persistence, and
> limiting effects of an individual's symptoms. Other evidence that we will consider
> includes statements from the individual, medical sources, and any other sources that
> might have information about the individual's symptoms, including agency personnel, as
> well as the factors set forth in our regulations.

SSR 16-3p, 2016 SSR LEXIS 4.

his decision and explain his conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which he relied into a single paragraph. *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in evaluating Carr's subjective symptom complaints. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125. The ALJ complied with the regulations by clearly stating that he rejected Carr's subjective symptom complaints because her testimony concerning the intensity, persistence, and limiting effects of her symptoms was not consistent with the medical and other evidence. *Felisky*, 35 F.3d at 1036; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 16-17, 20). Further, the ALJ was not required to explicitly discuss each of the regulatory factors in one paragraph. *Buckhannon ex rel. J.H.*, 368 F. App'x at 678-79. Reading the ALJ's decision as a whole and with common sense, the ALJ considered all the record evidence – including Carr's hearing testimony, her statements to treatment providers, and medical opinion evidence – regarding her daily activities, the nature of her symptoms, the type and efficacy of any treatment, and other factors concerning her functional limitations. *Buckhannon ex rel. J.H.*, 368 F. App'x at 678-79; SSR 16-3p, 2016 SSR LEXIS 4; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 16-20). Substantial evidence also supported the ALJ's conclusion that Carr's subjective complaints regarding her standing and walking limitations were inconsistent with the medical and other evidence, including: (1) Carr's testimony that she could walk 200 yards at a time and controlled her breathing issues with medications; (2) exam findings that she had a normal range of motion, normal lung and heart functions, no respiratory distress, no edema, normal strength, and a normal gait; (3) scans showing no pulmonary embolism; (4) her statements to treatment providers denying shortness of

17

breath and walking difficulties; and (5) Dr. McKee's and Dr. Freihofner's opinions that Carr

could stand, sit, or walk for 6 hours in an 8-hour workday.  *Rodgers*, 486 F.3d at 241; (Tr. 16-20,

45-46, 48, 990-93, 1024-27, 1240, 1253, 1277, 1433-35, 1456-57, 1461, 1585, 1589-90, 1630,

1650-51, 1660, 1664-65, 1921, 2049, 2060, 2094, 2143, 2158, 22310, 2314, 2316-17, 2366,

2402, 2447-48).

      Because the ALJ applied proper legal standards in evaluating Carr's subjective symptom

complaints and substantial evidence supported his conclusion that Carr's subjective complaints

were inconsistent with the medical and other evidence, the ALJ's decision to reject Carr's

subjective complaints fell within the Commissioner's "zone of choice."  42 U.S.C. §§ 405(g),

1383(c)(3); *see also Elam*, 348 F.3d at 125; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241;

*Mullen*, 800 F.2d at 545.  Accordingly, I recommend the Court affirm the ALJ's decision to

reject Carr's subjective symptom complaints.

### C.    Disability Determination

      Carr argues that, because the ALJ erroneously failed to credit her subjective complaints

regarding her inability to perform the standing and walking requirements of light work, the

ALJ's Step Five disability analysis was not supported by substantial evidence.  ECF Doc. 13 at

5.  Carr asserts that she would have been disabled under the Medical Vocational Guidelines if

she were limited to sedentary work.  *Id.*  The Commissioner's response brief does not address

this issue.  *See generally* ECF Doc. 15.

      At the final step of the sequential analysis, the burden shifts to the Commissioner to

produce evidence supporting the contention that the claimant can perform a significant number

of jobs in the national economy.  *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir.

2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  An ALJ may determine whether the

claimant has the ability to perform work in the national economy by applying the

medical-vocational guidelines.  20 C.F.R. §§ 404.1569, 416.969; 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00.  The medical-vocational guidelines establish matrices that correlate variables— including the claimant's RFC, age, educational background, and previous work experience.  *See generally* 20 C.F.R. Pt. 404, Subpt. P, App. 2.  When these variables are entered into the appropriate matrix, a finding of disabled or not disabled is directed.  *Id.*  Nevertheless, the medical-vocational guidelines "do not cover all possible variations of factors." 20 C.F.R. §§ 404.1569, 416.969.  When a claimant's particular characteristics do not coincide with a rule's corresponding criteria, such as when a claimant is unable to perform the full range of a category of work, the medical-vocational guidelines do not direct a conclusion of disabled or not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d).

Age and education are vocational characteristics that affect a claimant's ability to work. 20 C.F.R. §§ 416.963(a), 416.964.  A person under age 50 is classified as "younger," a person aged 50 to 54 is classified as "closely approaching advanced age," and a person aged 55 or older is classified as "advanced age." 20 C.F.R. §§ 404.1563(c)–(e), 416.963(c)–(e).  A person with a 12th grade education or above is classified as having "high school education and above," and is generally considered to be able to do semi-skilled through skilled work. 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4).  A person with a 7th through 11th grade level education is classified as having "limited education," and is generally unable to do most of the more complex job duties needed in semi-skilled or skilled jobs. 20 C.F.R. §§ 404.1564(b)(3), 416.964(b)(3).  A person with a 6th grade level education or less is classified as having "marginal education," and is generally limited to simple, unskilled work. 20 C.F.R. §§ 404.1564(b)(2), 416.964(b)(2). When a person is "closely approaching advanced age," has no transferrable skills, and has limited or greater education, the Medical-Vocational Guidelines direct that the individual is:

(1) disabled if limited to sedentary work; and (2) not disabled if limited to light work.  20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 210.14, 202.14.

Alternatively, an ALJ may determine that a clamant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

The ALJ applied proper legal standards and reached a decision supported by substantial evidence in determining that she was not disabled at Step Five.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125.  Because the ALJ determined that Carr could not perform the full range of light work, the ALJ properly relied on VE testimony to determine whether Carr was disabled. *Howard*, 276 F.3d at 238; 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d); 20 C.F.R. §§ 404.1569, 416.969; (Tr. 21-22)  Further, the VE's testimony that Carr could work as a photocopy machine operator, mail clerk, and electronic accessories assembler was substantial evidence supporting the ALJ's conclusion that Carr could perform a significant number of jobs,

because the ALJ's hypothetical question reflected Carr's actual characteristics and RFC, excluding the alleged functional limitations that the ALJ did not find credible. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 16, 50-51).  Although Carr is right that the Medical-Vocational Guidelines would have directed a disability finding if the ALJ had limited her to sedentary work, the ALJ was not required to include that limitation in his hypothetical question to the VE because he found that she could perform light work at Step Four. *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 16); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 210.14.  Therefore, the ALJ properly concluded that Carr was not disabled under the Social Security Act and denied her applications for DIB and SSI, and the court should not disturb that decision.  42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Jones*, 336 F.3d at 476; *Rogers*, 486 F.3d at 241.

I recommend the Court affirm the ALJ's Step Five determination that Carr was not disabled.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Carr's applications for disability insurance benefits and supplemental security income be AFFIRMED.

Dated: May 24, 2019

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See*

*United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).